**BOUER LAW LLC**
**By: Jodi F. Bouer**
**Atty No.:jb2063**
**84 Hardy Dr.**
**Princeton, NJ 08540**
**Tel:(609) 924-3990**
**Fax:(609) 964-1776**
**jbouer@bouerlaw.com**
**Attorney for Plaintiffs**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| S.K. and M.M. individually and on behalf of S.M., <br><br> Plaintiffs, <br><br> v. <br><br> Excellus Blue Cross Blue Shield, <br><br> Defendant. | CIVIL ACTION NO. <br><br><br> COMPLAINT |

Plaintiffs, S.K., M.M. and their minor child, S.M. ("Plaintiffs"), by and through their undersigned counsel, file this Complaint against the Defendant, Excellus Blue Cross Blue Shield ("Defendant" or "Excellus"), and state as follows:

### I. INTRODUCTION

1. S.M. is a four-year old child diagnosed with an autism spectrum disorder ("ASD"). Her treating physician has

prescribed speech therapy and occupational therapy for her ASD.

2.    Even though her insurer, Excellus, has admitted to medically necessity for speech and occupational therapy and previously authorized these services, it has refused to authorize services beyond a lifetime limit of 60 visits in the relevant insurance policy and has applied utilization review criteria that is not applied to other medical and surgical benefits.

3.    Plaintiffs seek relief under the Employee Retirement Security Act ("ERISA"), 29 U.S.C. § 1132 et. seq. (2014), which incorporates the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (the "MHPAEA").  29 U.S.C. § 1185a, 42 U.S.C. § 300gg-26.  The MHPAEA prohibits insurers from applying more restrictive visit limits and evidentiary factors/standards for coverage of services for mental health conditions such as ASD.

## II.  **PARTIES**

4.    Upon information and belief, Excellus is an insurance company doing business and licensed in New York, with its corporate headquarters located in Rochester, New York. In this Complaint, "Excellus" refers to the named

defendant and all successor, predecessor, subsidiary, parent and related entities to which these allegations pertain.

5.    Plaintiffs, S.K. and M.M. are the parents of S.M., a 4 year-old child diagnosed with an ASD.  S.K. is a participant, and M.M. and S.M. are beneficiaries under employer S&P Developer Group's ("S&P") health insurance plan. On behalf of S.M., Plaintiffs have submitted insurance appeals to Excellus seeking coverage for S.M.'s speech and occupational therapy services, which are medically necessary to treat her diagnosis of ASD.  The Plaintiff's represent S.M.'s interest in this matter.

6.    Plaintiffs reside at 916 Ives Lane in Atlanta, Georgia. At all times relevant hereto, they were insured under S&P's small group health insurance plan, 00005868, ID No. YND201726052, Simply Blue Plus Platinum PPO ("The Policy"), issued by Excellus. The Policy is governed by ERISA, 29 U.S.C. § 1132 et. seq. (2014) and the MHPAEA, 42 U.S.C. § 300gg-26. Attached hereto as Exhibit A is a true and correct copy of the Policy.

### III. <u>JURISDICTION & VENUE</u>

7.    This action is brought under ERISA, 29 U.S.C. §§ 1101 *et seq*. because it involves claims for employee benefits under a plan regulated and governed by ERISA.  Jurisdiction

is predicated under 28 U.S.C. § 1131 because this matter
involves federal questions pertaining to ERISA.

8.    Venue is appropriate in federal court in New York.
The Policy states that any disputes shall be resolved in a
court in the State of New York, this matter involves an ERISA
claim, and upon information and belief, Defendant does
business and insures policyholders throughout the state of
New York.    See Exhibit A at pp. 92 & 96. See 29 U.S.C. §
1132 (e)(2); and 28 U.S.C. § 1391(b)(3).

## IV.    STANDARD OF REVIEW

9.    Defendant's denial of coverage is subject to de
novo review based on the regulatory violations referenced
herein, and Defendant's failure to timely respond to appeals.

## V. STATUTORY AND REGULATORY FRAMEWORK

### A. The Federal Mental Health Parity Act

10.   On October 3, 2008, Congress passed the MHPAEA,
with an effective date of October 3, 2009.

11.   The MHPAEA is incorporated within ERISA.  By virtue
of the Patient Protection and Affordable Care Act ("ACA"),
the MHPAEA also applies to all small group insurance plans
that provide mental health benefits.  See 42 U.S.C. §
18031(j); 45 C.F.R. 156.115(a)(3).

12.   The MHPAEA prohibits insurers that offer mental health benefits from imposing less favorable benefit limitations than are imposed on medical/surgical benefits. See 42 U.S.C. § 300gg-26; 45 C.F.R. 146.136(f).

### 1.   Quantitative Treatment Limitations Under the MHPAEA

13.   Pursuant to the MHPAEA, insurers that provide coverage for the treatment of mental health conditions are prohibited from applying quantitative limits such as visit limits on services for mental health conditions that are more restrictive "than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan."   See 42 U.S.C. § 300gg-26(a); 45 C.F.R. 146.136(b).

14.   The MHPAEA regulations define the term treatment limitation to include:

> limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment.   29 C.F.R. 2590.712 (c)(3)(B)(iii).

15.   The MHPAEA regulations define the term "mental health condition" as:

> consistent with generally recognized independent standards of current medical practice (for example, the most current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), the most current version of the ICD, or State guidelines).   29 C.F.R. 2590.712(a).

16. ASD is included as a mental health condition in the DSM and ICD and is also defined as a mental health condition in the Policy. Thus the Policy here must comply with the MHPAEA with respect to benefits for services used to treat an ASD.

17. Speech therapy and occupational therapy prescribed to treat an ASD are services with respect to a mental health condition and are protected by the MHPAEA. The manifestations of ASDs often involve a complexity of deficits in social interactions, non-verbal and verbal communication, sensory, neuro-motor, and behavioral issues, the treatment of which often includes speech and occupational therapy, as well as behavioral therapies. These therapies are provided to address the deficits and conditions that form the basis of an ASD diagnosis as set forth in the DSM.

18. According to the relevant federal regulations, the MHPAEA requires plans covering mental health benefits to ensure that:

> The treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 C.F.R. 2590.712(c)(2)(ii).

6

19.   In determining compliance with the MHPAEA, the MHPAEA regulations require treatment limitations to be measured by comparing treatment limitations within six broad benefit classifications, including the classification of outpatient, out of network services, which are at issue in the present matter.   See 42 U.S.C. § 300gg-26(a); 45 C.F.R. 146.136(b)(Inpatient in-network, Inpatient out-of-network, Outpatient in-network, Outpatient out-of-network, Emergency care, Prescription drugs).

20.   Under the MHPAEA, an insurer, as in the present case, cannot apply a lifetime or annual limit on speech therapy or occupational therapy used to treat ASDs where that limit is not imposed as a predominant treatment limitation on substantially all benefits for services for medical/surgical conditions. Rather, if, as here, an insurance policy covers substantially all medical and surgical benefits without visit limits, the MHPAEA requires that the policy must cover speech and occupational therapy for the treatment of an ASD on an unlimited basis.

21.   Under New York law, speech and occupational therapy are mandated for the treatment of ASDs as required by the New York Autism Insurance Mandate.   N.Y. Ins. Law § 3221(l)(17)(B) & (C)(viii).

22.   Pursuant to the MHPAEA, insurers cannot apply a

lifetime or annual limit on state mandated speech therapy or occupational therapy used to treat an ASD diagnosis, and must increase coverage where, as here, that limit is not imposed as a predominant treatment limitation on substantially all benefits for medical/surgical benefits.  See 78 FR 68240-01.

23.  In fact, State Departments of Insurance considering application of the MHPAEA to speech and occupational therapy used to treat ASDs.  They have concluded that quantitative/visit limits applicable to these therapies cannot be applied in relationship to ASDs and have ordered insurers to pay for these therapies on an unlimited basis pursuant to the MHPAEA.

24.  The Oregon Department of insurance stated in Oregon Insurance Division Bulletin Ins. 2014-1 (II)(D):

> Although these [visit] limitations or exclusions are allowed under state law, insurers must be mindful of the restrictions on these exclusions or limitations under the MHPAEA or other mandates ... For example the 45 day standard for long-term residential mental health programs in 743A.168(4)(a) is a quantitative treatment limitation prohibited by MHPAEA unless substantially all medical treatments in the same classification are subject to the same or more restrictive limitations. Similarly, the 30-visit limits for speech therapy, occupational therapy and physical therapy in Oregon's Essential Health Benefits package are quantitative treatment limitations prohibited by MHPAEA when the therapy is to treat a mental health condition. (emphasis added).  Attached hereto as Exhibit B is a true and correct copy of the Oregon Bulletin.

25.   The New Jersey Department of Banking and Insurance has similarly issued a directive stating that under the MHPAEA, insurers can no longer apply visit limits to speech and occupational therapy to treat an ASD under state regulated plans.   In noticing the public hearing on the issue, DOBI stated that the application of a visit limit on speech and occupational therapy to treat ASDs was a violation of the MHPAEA:

> To comply with the requirements of the federal Paul Wellstone and Pete Domenici Mental Health Parity Equity and Addiction Act of 2008 (MHPAEA), Public Law 110-343, and the final regulations at 29 C.F.R. 2590.712 as well as 45 C.F.R. 146.136 and 45 C.F.R. 147.160, the payment limits included on the schedule pages are being amended to specify that the 30-visit limit for physical therapy, occupational therapy and speech therapy does not apply when the therapy is to treat autism. The 30-visit limit is a cumulative quantitative treatment limitation prohibited by 29 C.F.R. 2590.712(c)(2) and 45 C.F.R. 146.136(c)(2). The provision in the forms contained in the various exhibits, detailing benefits for the treatment of autism and other developmental disabilities, has been similarly amended.
>
> …
>
> The SEH Board expects that the amendments necessitated by MHPAEA will have a positive social impact with respect to the families of persons with autism. The availability of physical, occupational and speech therapy without any visit limits will allow families to continue such therapies beyond the prior 30-visit limit[.] Attached hereto as Exhibit C is a true and correct copy of the DOBI Notice of Public Hearing.

26.   In California, under the state's mental health parity act, which is similar to the MHPAEA, emergency regulations were issued stating that insurers could not place visit or dollar limits on speech and occupational therapy when medically necessary to treat a mental health conditions. See Cal. Code Regs., tit. 10, Sec. 2562.3.

27.   Centers for Medicare and Medicaid ("CMS") guidance also indicates that the application of a visit limit on speech and occupational therapy for the treatment of an ASD is a violation of the MHPAEA where, as here, more restrictive predominate visit limits are applied to therapies to treat an ASD than to other medical and surgical benefits.   The CMS Self-Assessment Tool states:

> This section identifies what, if any, quantitative treatment limitations are applied to covered MH/SUD services. If a treatment limit is applied (such as a limit on the number of visits covered), it cannot be more restrictive than a treatment limit that applies to medical/surgical services …

> Physical therapy and occupational therapy will likely not meet the "substantially all" test outlined in the regulations. If a state wishes to include these limits as a comparison for treatment limits, it should be prepared to have the underlying data to show these services account for more than 66 percent of the total services within that benefit classification. CMS, "Self-Assessment Tool for Comportment of Medicaid Alternative Benefit Packages with the Mental Health Parity and Addiction Equity Act", State Technical Assistance Resources, No. 1 (2013). Attached hereto as Exhibit

D is a true and correct copy of the CMS Self-Assessment Tool.

### 2. Nonquantitative Treatment Limitations under the MHPAEA

28. In addition to the prohibition against more stringent quantitative limitations in the MHPAEA, the MHPAEA prohibits insurers from applying more stringent nonquantitative limits on services for mental health conditions that are applied to medical and surgical benefits covered by the plan.   See 42 U.S.C. § 300gg-26(a); 45 C.F.R. 146.136(b). 29 C.F.R. 2590.712 (c)(4)

29. A nonquantitative limitation is one that is not related to a financial requirements or visit limits which are defined as quantitative limits, but instead relates to the processes, strategies, evidentiary factors used by an insurer to additionally limit its coverage obligation.

30. According to the CMS, the federal regulations distinguish between quantitative treatment limitations and nonquantitative treatment limitations:

> Quantitative treatment limitations are numerical, such as visit limits and day limits. Nonquantitative treatment limitations include but are not limited to medical management, step therapy and pre-authorization. … Attached hereto as Exhibit E is a true and correct copy of https://www.cms.gov/CCIIO/Programs-and-Initiatives/Other-Insurance-Protections/mhpaea_factsheet.html at p. 3.

31.  The CMS further states that under the MHPEA:

A <u>group health plan</u> or coverage <u>cannot impose a</u>
<u>nonquantitative treatment limitation</u> with respect
to MH/SUD benefits in any classification <u>unless</u>,
under the terms of the plan (or coverage) as
written and in operation, any processes,
strategies, evidentiary standards, or other factors
used in applying the nonquantitative treatment
limitation to MH/SUD benefits in the classification
are comparable to, and are applied no more
stringently than, the processes, strategies,
evidentiary standards, or other factors used in
applying the limitation with respect to medical
surgical/benefits in the classification.  The final
regulation eliminated an exception that allowed for
different nonquantitative treatment limitations "to
the extent that recognized clinically appropriate
standards of care may permit a difference.  <u>Id.</u>


32.  Accordingly, the MHPAEA regulations state:

A group health plan (or health insurance coverage)
may not impose a nonquantitative treatment
limitation with respect to mental health or
substance use disorder benefits in any
classification unless, under the terms of the plan
(or health insurance coverage) as written and in
operation, <u>any processes, strategies, evidentiary</u>
<u>standards, or other factors</u> used in applying the
nonquantitative treatment limitation to mental
health or substance use disorder benefits in the
classification <u>are comparable to, and are applied</u>
<u>no more stringently than</u>, the processes,
strategies, evidentiary standards, or other factors
used in applying the limitation with respect to
medical/surgical benefits in the classification. 29
C.F.R. 2590.712 (c)(4).

**B. ERISA FIDUCIARY OBLIGATION AND REGULATORY OBLIGATIONS**

33.   ERISA and the MHPAEA impose an obligation on insurers to comply with statutory and regulatory provisions thereunder.

34.   Insurers have a fiduciary obligation in their interpretation of their policy obligations, claims processing and issuance of denials so that they conform with federal law. See 29 U.S.C. § 1104(a).

35.   The requirements of ERISA and the MHPAEA preempt an insurer's interpretation of its policy provisions, and thus any interpretation by an insurer that is contrary to ERISA or the MHPAEA is a breach of the statutes and an insurer's fiduciary obligation.

36.   An insurer further breaches the federal law and its fiduciary obligation under ERISA by interpreting its coverage obligations and/or denying claims in violation of related regulations, including but not limited to regulations that govern an insurer's obligation to issue denial letters and respond to appeals.

37.   Such regulatory violations include but are not limited to:

  • Failure to issue a denial letter prior to the issuance of the first level grievance determination. 45 C.F.R. 147.136(b)(ii)(E); 29 C.F.R. 2560.503-1(g).

- Failure to issue a denial letter that references diagnosis and other required information.  45 C.F.R. 147.136(b)(ii)(E); 29 C.F.R. 2560.503-1(j).

- Failure to produce the records on which its denial(s) were based.  45 C.F.R. 147.136 (b)(2)(ii)(C); 29 C.F.R. 2560.503-1(h), (i), (j) and (m)(8).

- Failure to include in denial letters notice of the relevant appeal provisions.  29 C.F.R. 2560.503-1(i)(5),(j).

- Failure to comply with the continuing coverage regulations under the ACA, which require insurers to continue to cover therapy during the course of the appeal process.  45 C.F.R. 147.136(b)(3)(iii); 29 C.F.R. 2560.503-1(f)(ii).

- Failure to give beneficiaries the ability to appeal and obtain a final determination prior to the denial of coverage.  45 C.F.R. 147.136; 29 C.F.R. 2560.503-1 (l).

- Failure to respond timely to appeals. 29 C.F.R. 2560.503-1(j).

38.   Moreover, an insurer breaches its fiduciary obligation when it requests confidential information in order to invoke coverage or denies coverage for failure by a beneficiary to produce same.

39.   The United States Constitution gives families and parents the right to privacy over their children's educational and other records. See e.g. 14th & 9th Amendments to the Unites States Constitution. An insurer violates this right when it hinges state mandated insurance benefits, as here, on the production of such protected information.

14

40.  Educational records are also confidential and protected under federal law pursuant to the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 C.F.R. Part 99, the New York Personal Privacy Protection Law, and N.Y. Pub. Off. Law § 96.

41.  Although the New York Autism Mandate, N.Y. Ins. Law § 3221(l)(17)(D), allows insurers to deny coverage for services provided "pursuant to" an Individualized Education Plan ("IEP"), and it also requires insurers to provide coverage for services "outside of an educational setting." It does not usurp the Constitutional right to privacy or federal and state confidentiality laws as to educational records.  It also does not allow insurers to compel parents of autistic children to obtain an IEP, allow the insurer to access confidential educational services/records or to make covered services contingent upon the production of school records, school services or the insurer's receipt of an IEP.

42.  It is a breach of ERISA an insurer's fiduciary obligation thereunder to, as here, fail to comply with its regulatory obligations, request confidential educational records, and make coverage contingent on the production of such records.

## FACTS

### A.    Diagnosis and Fight for Coverage

43.    S.M., is the biological child of S.K. and M.M. As a baby, S.M. had early challenges bonding, including lack of eye contact, discomfort while being held, and difficulties with breastfeeding.  By age two (2), S.M.'s parents noticed she lacked interest in socializing, had an extreme fear of strangers, and extreme sound sensitivity.

44.    S.M. was diagnosed with an ASD in July of 2013 by developmental pediatrician, Dr. Leslie Rubin, who recommended she receive assessments for speech, occupational and behavioral health therapies to treat her condition.  See Developmental Pediatric Specialist's Initial Evaluation dated July 24, 2013.

45.    After S.M. was assessed on July 24, 2013 and August 8, 2013, speech and occupational therapy were recommended by her physician to treat her diagnosis of an ASD. S.M. began speech and occupational therapy in August of 2014, which was provided by licensed speech therapist, Laurie Botstein and licensed occupational therapist, Kate Drummond.  See Speech Therapist's Initial Evaluation dated August 6, 2013 and Occupational Therapist's Initial Evaluation dated July 31, 2013.

46.   Defendant Excellus admitted that speech and occupational therapy were medically necessary to treat S.M.'s ASD when it eventually authorized speech and occupational therapy for S.M.  <u>See</u> Excellus's speech and occupational therapy authorizations, dated respectively, August 22, 2014 and October 17, 2014.

47.   When S.K. initially inquired through her employer's insurance broker about coverage for ASD services, she was told that ASD therapies would be covered without limits.  In an email response, DJ Brien, Account Sales Consultant, Excellus BCBS, Rochester Region, stated:

> As for the autism benefit, the cost sharing is not affected by the mandate.  Meaning that the family will still be responsible for copays and any other out of pocket costs.  The mandate also has no visit limits when the treatment is for the Autism Spectrum Disorders. Attached hereto as Exhibit F is the redacted email from DJ Brien dated June 26, 2014.

48.   After the initial authorizations for speech and occupational therapy were issued for her child's first 20 sessions, S.K. had significant trouble getting additional therapy authorized by Excellus.  Although she was previously advised that the Policy did not have limits on speech and occupational therapy, she learned for the first time from Excellus, on October 2, 2015, that the Policy had a lifetime visit limit on these therapies.  On that date, she received a

phone call from Chandra Santiago, who informed her that she only had 60 sessions total of speech and occupational therapy under the Policy, per condition, per lifetime and that she would no longer possibly have coverage for her child's therapies.

49.   However, on October 7, 2014, Ms. Santiago called back S.K. and stated that there were no limits on treatments related to an ASD. She advised that if Excellus still attempted to limit sessions, she would put a note in the file and recommend that services be approved.  Despite Santiago's representation, however, once all authorized services were utilized, Excellus refused to authorize additional speech and occupational therapy services for S.M.

50.   On October 13, 2015, Ms. Santiago called S.K. again and advised her that the Excellus medical director wanted a copy of S.M.'s IEP.   In fact, in and around this time period, About Play, the occupational therapy agency working with S.M., received a formal request for her IEP, dated October 7, 2014.   The unsigned letter (reference No. MR1408780), stated:

> In order to be able to consider this request for approval [presumably for additional occupational therapy sessions, though this is not stated] we need the informational listed below.  It is necessary to wait for the receipt of this information to determine the medical appropriateness of the requested services.  If

the information is not received by November 21, 2014, we will render a decision based upon the information currently available and your request may be denied. … This request is pended by the Medical Director for the following:  the Individual Educational Program must be received in order to review for additional therapy visits. Attached hereto as Exhibit G is the redacted correspondence from Excellus to About Play dated October 7, 2014.

51.  On October 14, 2014, S.K. called Excellus and spoke with Janelle in customer service, who reiterated that pursuant to Excellus's internal guidelines, S.K. was required to produce S.M.'s IEP to invoke coverage. (call reference number 141014007678.) S.K. replied to Excellus in a fax, stating:

> [S.M.] is not yet in school and … does not currently have an Individual Education Plan. Various documents have been submitted regarding [S.M.]'s autism spectrum diagnosis ... these clearly state her diagnosis, challenges, and condition.  Approval or denial of additional Occupational Therapy sessions should be based on the expert practitioners/clinicians notes.  If further sessions are to be denied, please clearly state the reason for denial ... Attached hereto as Exhibit H is the redacted fax from S.K. to Excellus dated October 14, 2014.

52.  On October 17, 2014, S.K. received a call from a utilization management nurse named Trish, who again informed her that per the medical director, no further speech or occupational therapy sessions beyond the 60-visit limit would be approved.  She was advised that the lifetime limit for speech and occupational therapy in the Policy had been

exhausted. The insurer had pre-approved 58 sessions at that point, and only two more were approved thereafter.

53. Another nurse, Patricia Morano, then called S.K. back and said that she had spoken to the medical director, and again confirmed that only 60 occupational and speech sessions were allowed under the Policy. Both Trish and Patricia encouraged S.K. to obtain an IEP for S.M. with the school district and also to file a grievance on the denial of services.

54. On October 20, 2014 S.K. called Excellus and spoke with representative Teressa Blocker. She asked how to file a grievance. At this point, she had never received a letter from Excellus denying authorization of additional speech and occupational therapy claims on the basis of the exhaustion of the 60-visit lifetime limit even though the Policy and federal law require the issuance of denial letters within strict timelines, which were not adhered to by Excellus.

55. Based on the oral denial of coverage, on October 22, 2014, Plaintiffs filed a grievance appeal. Attached hereto as Exhibit I is a redacted copy of Plaintiffs' October 22, 2014 Grievance letter. Therein, Plaintiffs summarized their experiences in obtaining authorizations, explained that S.M. was not yet enrolled in school and did not have an IEP, and emphasized that Excellus needed to base its decision to

approve or deny her care on the expert medical
recommendations of the treating providers.

56.  On October 22, 2014, Ms. Morano called back S.K.
and gave her the number for the Atlanta public school system
so that she could request an IEP meeting.  Ms. Morano
continues to call Plaintiffs from time to time and ask what
is going on with their request for services from the public
school system.

57.  Excellus responded to the Plaintiffs' first level
grievance in correspondence dated November 7, 2014, denying
S.M. additional sessions of speech and occupational therapy
on the basis of a 60-visit lifetime limit, but failed to
refer to the provisions or page numbers in the policy
referencing such a limit. Attached hereto as Exhibit J is the
redacted first level denial letter dated November 7, 2014.
The first level denial letter also did not include diagnosis
references, treatment code information, appeal
instructions/enclosures and Excellus never provided
Plaintiffs with the documents on which the denial was based.

58.  The denial letter stated:

> According to your benefits, we will provide 60
> combined visits of physical, speech and
> occupational therapy, per condition, per lifetime.
> Our records indicate all 60 visits were approved
> under the above referenced authorization numbers.
> This remains denied a contractual limit at this
> time.  See Id.

59.   In correspondence dated April 10, 2015, Plaintiffs submitted a second level appeal letter in response to Excellus's first level denial, and raised various objections to the denial on the basis of the ACA, the MHPAEA, New York law and various state and federal regulations. Attached hereto as Exhibit K is Plaintiffs' redacted Second Level Appeal Letter dated April 10, 2015, without exhibits.

60.   Despite various calls from Plaintiffs inquiring about a response to their appeal, Excellus's response to Plaintiffs' second level appeal letter was not received by Plaintiffs until over 5 and 1/2 months later. Attached hereto as Exhibit L is Excellus's redacted denial letter dated September 24, 2015.

61.   Although Excellus intermittently paid for S.M.'s speech and occupational therapy sessions after the second level appeal was filed, many of her claims during that time period were not paid.  Moreover, since Excellus issued the second level denial letter in September of 2015, S.M.'s speech and occupational therapy claims are being roundly denied.

62.   In the course of the denial and appeal process in this matter, Excellus violated various federal regulations by:

· Failing to provide Plaintiffs with a denial letter prior to the issuance of the first level grievance determination.  45 C.F.R. 147.136(b)(ii)(E); 29 C.F.R. 2560.503-1(g).
Failing to provide Plaintiffs with a denial letter that references diagnosis and other required information.  45 C.F.R. 147.136(b)(ii)(E); 29 C.F.R. 2560.503-1(j).

· Failing to produce the records to Plaintiffs on which its denial(s) were based.  45 C.F.R. 147.136 (b)(2)(ii)(C); 29 C.F.R. 2560.503-1(h), (i), (j) and (m)(8).

· Failing to include and provide Plaintiffs with notice of the relevant appeal provisions in the Policy.  29 C.F.R. 2560.503-1(i)(5),(j).

· Failing to comply with the continuing coverage regulations under ACA, which requires insurers to continue to cover therapy during the course of the appeal process.  45 C.F.R. 147.136(b)(3)(iii).

· Failing to give Plaintiffs the ability to appeal and obtain a final determination prior to the denial of coverage.  45 C.F.R. 147.136; 29 C.F.R. 2560.503-1 (l).

· Failing to respond timely to Plaintiffs' second level appeal. 29 C.F.R. 2560.503-1(j).

63.  Plaintiffs are suffering great hardship because of Defendant's imposition of a lifetime 60-vist limit on their child's state mandated speech and occupational therapy. Excellus has previously authorized and therefore admits that this therapy is medically necessary, yet it continues to deny coverage for these therapies even though such a denial is in violation of the MHPAEA.  The Plaintiffs have only $30,000 in

annual income and has been forced to use their savings to pay between $527.50 to $610 per week for S.M.'s medically necessary services (twice weekly per therapy.

**B.    Relevant Insurance Policy Language and Limitations**

**1.    General Policy Provisions**

64.    The Policy has two internal appeal levels, which Plaintiffs have exhausted.  See Exhibit A at pp. 70-71.

65.    The Policy covers speech and occupational therapy under various provisions, including under the Rehabilitation and Habilitations provisions and the autism rider. See Exhibit A at p. 42.

66.    Although somewhat equivocal on whether it is a combined limit, the Policy has a 60-visit per life, per condition limit for speech, occupational and physical therapy under the Rehabilitation and the Habilitation provisions. See Exhibit A at pp. 36, 49, 103 & 105.

**2.    Autism Spectrum Disorder Benefit**

67.    The Policy covers outpatient mental health services including treatment of mental, nervous and emotional disorders.  See Exhibit A at p. 51.  Under Section VI Additional Benefits, the Policy covers services to treat an ASD, which is defined as a mental health condition pursuant to the Diagnostic and Statistical Manual of Mental Disorders ("DSM").  The Policy defines  "autism spectrum disorder" as:

any pervasive developmental disorder
defined in the most recent edition of the
Diagnostic Statistical Manual of Mental
Disorders at the time services are
rendered, including autistic disorder;
Asperger's disorder; Rett's disorder;
childhood disintegrative disorder; and
pervasive developmental disorder not
otherwise specified (PDD-NOS). <u>See</u> Exhibit
A at p. 42.

68.   Under Section VI, Additional Benefits, the Policy
covers customary treatments provided to children with an ASD,
such as speech and occupational therapy, when they are
medically necessary for "the screening, diagnosis, and
<u>treatment of autism spectrum disorders</u>." It further states
"<u>[e]xcept as otherwise prohibited by law</u>, services provided
under this paragraph shall be included in any visit maximums
applicable to services of such therapists or social workers
under this Certificate." <u>See</u> Exhibit A at p. 43 (emphasis
added).

### 3.   Quantitative Treatment Limits for Out-Patient Out of Network Services

69.   Under the Policy, treatment limitations (visit
limits) applied to speech and occupational therapy under the
rehabilitative, habilitative and home health care and to ASD
by reference to these limits in the Autism Benefit, are more
restrictive than the predominant treatment limitations that
are applied to substantially all medical and surgical
benefits for outpatient out of network services.  In fact,

the only visit limits in the Policy for outpatient, out-of-network medical and surgical benefits apply to rehabilitative, habilitative, and home healthcare benefits. See Exhibit A at Schedule of Benefits.

70.  In such circumstances, the application of the 60-visit lifetime limit on speech and occupational therapy for the treatment of an ASD is violation of MHPEA because it contains is limitation that is more restrictive than predominant treatment limitations applied to substantially all medical and surgical benefits in the outpatient out of network classification. As stated in the Policy, such a limitation may not be enforced by Defendant because it is "prohibited by law" under the MHPEA.

### 4.  Nonquantitative Limitations Applied to Out-Patient, Out of Network Speech and Occupational Therapy Services to Treat ASD

71.  The MHPAEA prohibits insurers from applying more stringent nonquantitative limits on services for mental health conditions that are applied to medical and surgical benefits covered by the plan.  See 42 U.S.C. § 300gg-26(a); 45 C.F.R. 146.136(b). 29 C.F.R. 2590.712 (c)(4).

72.  A nonquantitative limitation is one that is not related to a financial requirements or visit limits which are defined as quantitative limits, but instead relates to the

processes, strategies, evidentiary factors used by an insurer to additionally limit its coverage obligation.

73.   In the present matter, Defendant required that the in order for the Plaintiffs to obtain coverage for S.M.'s speech and occupational therapy treatments for her mental health condition of ASD, the family needed to obtain an IEP, and provide Defendant with confidential IEP information, records and services.

74.   Upon information and belief, in relationship to any other medical conditions or surgical or medical benefits, Defendant does not require as a predicate to coverage that beneficiaries obtain an IEP or the produce an IEP or confidential school related information.

75.   As such, in the present matter, Defendant has applied a more stringent evidentiary standard/process than is required for access treatment for medical conditions, in violation of the MHPAEA.

## CAUSES OF ACTION

### COUNT 1

**BREACH OF FIDCUCIARY DUTY UNDER ERISA**
**ERISA § 404(a)(1), 29 U.S.C. § 1104(a)**

76.   Plaintiffs repeat and reallege the paragraphs above as if more fully set forth herein.

77.   Excellus has a fiduciary obligation under ERISA as it administers claims and makes benefit determinations under the Policy at its discretion.

78.   As fiduciary under ERISA, Excellus is obliged to act solely in the interest of the participants and beneficiaries, and has an obligation to administer claims and make benefit determinations according to the law.   Id.

79.   The Policy bars Excellus from applying visit limits speech and occupational therapy for children with ASD where such limits are "prohibited by law." See Exhibit A at p. 43 (emphasis added).

80.   ERISA's provisions, which incorporate the MHPEA, supersede and preempt any contrary plan provisions or internal utilization review/evidentiary criteria used by Excellus in administering claims or making benefit determinations under an insurance plan.

81.   Pursuant to the MHPAEA, insurers that provide coverage for the treatment of mental health conditions as provided in the Policy, are prohibited from applying more restrictive limitations (quantitative and nonquantitative) "than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan."   See 42 U.S.C. § 300gg-26(a); 45 C.F.R. 146.136(b); 29 C.F.R. 2590.712 (c)(3)(B)(iii) (defining

treatment limitations to include limits on the frequency of treatment, number of visits, days of coverage, or other similar limits).  29 C.F.R. 2590.712(c)(2)(ii) (outlining nonquantitative limits in violation of the MHPAEA).

82.  Excellus breach its fiduciary obligation under ERISA and violated the MHPAEA by imposing a 60-visit lifetime limit on S.M.'s speech and occupational therapy to treat her ASD, which is a mental health condition under the MHPEA regulations. See 29 C.F.R. 2590.712(a).

83.  Excellus breached is fiduciary obligation under ERISA and violated the MHPEA by applying a more stringent evidentiary standard/process in the utilization review of S.M.'s therapy (by requesting/making coverage contingent on the production of IEP information/educational records) than is required for access to treatment for medical conditions (where such records are not typically requested/required).

84.  Excellus also breached its fiduciary obligation under ERISA obligation by requesting/requiring confidential educational records in the course of administering S.M's speech and occupational therapy benefits.  See e.g. Fourteenth Amendment of the United States Constitution; 20 U.S.C. § 1232g; and the New York Personal Privacy Protection Law, N.Y. Pub. Off. Law § 96.

85.  Excellus also breached its fiduciary obligation under ERISA by failing to comply with regulations under ERISA and the ACA in the denial and appeal process.

86.  All internal administrative remedies have been exhausted in this matter and Plaintiffs have performed all conditions precedent to filing this lawsuit.

87.  Due to Excellus's improper benefit determination, Plaintiffs have incurred attorneys' fees and costs.

88.  Plaintiffs are entitled to: relief clarifying and enforcing their rights under the Policy, a declaratory judgment as to past and future benefits under the Policy; an order adjudging Defendant in breach of ERISA, the MHPAEA and its fiduciary obligation; restitution; disgorgement; prejudgment and post judgment interest; attorneys' fees and costs pursuant to 29 U.S.C § 1132(g)(1); and such other relief as the court deems just and proper.

## COUNT 2

### CLAIM FOR RECOVERY OF BENEFITS AND CLARIFICATION OF RIGHTS ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

89.  Plaintiffs repeat and reallege the paragraphs above as if more fully set forth herein.

90.  ERISA allows a participant or beneficiary to bring an action to "recover benefits under the terms of the plan, or clarify his rights to future benefits under the terms of

the plan." See ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B),

91. The Policy is a small group plan subject to ERISA, which incorporates the MHPAEA.

92. Excellus violated ERISA by imposing a 60-visit lifetime limit on S.M.'s speech and occupational therapy contrary to the MHPAEA.

93. Excellus violated ERISA by using evidentiary standards in its utilization review process, which upon information and belief, are not required of any medical conditions contrary to the MHPAEA.

94. All internal administrative remedies have been exhausted in this matter and Plaintiffs have performed all conditions precedent to filing this lawsuit.

95. Due to Defendant's improper benefit determination, Plaintiffs have incurred attorneys' fees and costs.

96. Plaintiffs are entitled to: relief clarifying and enforcing their rights under the Policy, a declaratory judgment as to past and future benefits under the Policy; an order adjudging Defendant in breach of ERISA, the MHPAEA and its fiduciary obligation; restitution; disgorgement; prejudgment and post judgment interest; attorneys' fees and costs pursuant to 29 U.S.C § 1132(g)(1); and such other relief as the court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, S.K., M.M. and S.M., pray for judgment against Defendant Excellus, as follows:

    1.   Requiring Defendant to cover and pay Plaintiffs' past due benefits for any of S.M.'s unreimbursed speech and occupational therapy services;

    2.   Required Defendant to disgorge its profits attributable to the violations described herein;

    3.   A Declaration that Defendant violated ERISA and the MHPAEA and breached its fiduciary obligation by: A) imposing a 60-visit limit on speech and occupational therapy to treat autism; and B) imposing evidentiary standards that are not imposed on medical conditions when it requested confidential educational records/IEP information and made coverage contingent on such a production.

    4.   A further Declaration that in relationship to services provided to treat an ASD, Defendant is barred from: A) relying on a 60-visit lifetime or annual limit as a basis to deny speech and occupational therapy claims in the future; B) barred from requesting that policyholders, participant, beneficiaries or healthcare providers provide it with IEP or other school records or information; C) requesting or inquiring about whether a policyholder, participant, or beneficiary has obtained school services or an IEP; and D)

making any coverage determinations contingent on policyholders, beneficiaries or their healthcare providers giving Defendant school records/information/school services or the policyholder/beneficiary obtaining an IEP.

4.    Attorneys fees and costs incurred in pursuing this action pursuant to 29 U.S.C. § 1132(g).

5.    Such other and further relief as the Court deems just and proper.

Respectfully submitted,
Bouer Law, LLC

BY: _____

Jodi F. Bouer
jb2063
Attorney for Plaintiffs

Dated:   February 16, 2016